## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| JULIE R. BURPO, | } |
| Plaintiff, | } |
| v. | } Case No.: 2:07-CV-0979-RDP |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | } |
| Defendant. | } |

### MEMORANDUM OF DECISION

Plaintiff Julie R. Burpo brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act (the "Act") seeking judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI") benefits. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed because it is supported by substantial evidence and the proper legal standards were applied.

**I.    Proceedings Below**

Plaintiff filed applications for a period of disability, DIB, and SSI benefits on September 19, 2002, alleging a disability onset date of February 1, 2000.[1]  (Tr. 71-73, 402-03). Plaintiff's applications were denied initially and also upon reconsideration. (Tr. 43-47). Plaintiff requested and received a hearing before an Administrative Law Judge ("ALJ"). (Tr. 18-19, 57-63). ALJ Jerome L. Munford heard Plaintiff's case on February 7, 2005, in Birmingham, Alabama. (Tr. 411-63). In

---

[1]In the hearing held February 7, 2005, Plaintiff's onset date of disability was amended to August 1, 2002.  (Tr. 421).

his decision dated October 19, 2005, the ALJ determined that Plaintiff was not eligible for disability, DIB or SSI benefits. The ALJ found that Plaintiff failed to meet the disability requirements of the Act and retained the residual functional capacity ("RFC") to perform sedentary work. (Tr. 20-40). After the Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 26, 2007 (Tr. 5-8), that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review.

At the time of the hearing, Plaintiff was forty-eight years old and had received a high school education with one year of community college. (Tr. 24, 307, 417, 451). Plaintiff had previously worked as a cashier, stocker, and school bus monitor. (Tr. 39, 90, 417-21). Plaintiff alleges that she has been unable to engage in substantial gainful activity since August 1, 2002 due to fibromyalgia, cervical and lumbar degenerative disc disease, radiculopathy, and chronic and severe pain. (Tr. 39, 77, 422-49). Plaintiff was insured for disability insurance benefits on her alleged onset date of disability of August 1, 2002. (Tr. 39, 74).

Between March 19, 2001 and February 23, 2005, Plaintiff received treatment for migraine headaches, neck, back, hip and arm pain, fibromyalgia, and degenerative disc disease. (Tr. 127-401). Plaintiff testified during the hearing that she stopped working due to her health issues. (Tr. 418). Plaintiff stated her medical problems began with her hands about 20 years ago when she experienced swelling and hurting, and thereafter she began having problems with her hip and back, which eventually lead to surgery on her hip. Plaintiff testified that her back and neck pain are due to three slipped discs that will require surgery in the future. (Tr. 423-26, 447). Additionally, Plaintiff testified that she has been suffering from migraine headaches for about 25 years, which she experiences every other day lasting as long as three to four days. (Tr. 443-44). Plaintiff further

testified that she has had a problem with her left foot swelling for about 19 years. Plaintiff stated that at first her foot was swelling everyday, but now she experiences swelling about once or twice per month and her foot will usually stay swollen for about two or three days. (*Id.*). Plaintiff stated she can sit for 30 minutes, stand for 10 minutes, walk about 2 blocks, and lift only the equivalent of a half gallon of milk. (Tr. 427).

Plaintiff testified that a typical day for her consists of seeing everyone out of the house, she then lays back down for a nap until around noon or 1:00 p.m., eats lunch, and her children return home from school around 3:00 to 3:30 p.m. If she is feeling up to it, she and her daughter will prepare dinner. (Tr. 433-34). Plaintiff further testified that she does not drive, but will accompany her husband to the grocery store about once per week. She attends Sunday morning church services, but is unable to sit through the entire service without having to get up and move around due to pain and discomfort. (Tr. 435-36). Plaintiff stated she does no household chores, but can shower, dress herself and put her shoes on, although sometimes she requires assistance from her daughter. (Tr. 437). Plaintiff relies upon the use of a cane everyday. (Tr. 441).

On March 19, 2001, Plaintiff was assessed by Dr. Terry V. Kinnebrew as having migraine headaches, back and arm pain, and possible degenerative disc disease, for which he prescribed Naprosyn. (Tr. 193-96). On April 23, 2001, Plaintiff again saw Dr. Kinnebrew complaining of hip and left leg pain from an injury she incurred while bowling eight days prior. (Tr. 192). Plaintiff was diagnosed as having a lumbosacral strain, degenerative joint disease and sciatica on the left. She was continued on her Naprosyn prescription and referred to physical therapy. (Tr. 187-96). From May 4, 2001 until April 30, 2002, Plaintiff had no new complaints while continuing physical therapy and taking Naprosyn. (Tr. 192). On August 14, 2002, Plaintiff presented with left shoulder pain, left hip

pain, right leg pain, and right arm pain. (Tr. 191). After examination, Dr. Kinnebrew found Plaintiff's joints grossly normal and her headaches stable and assessed her with fibromyalgia due to her reproducible arm and leg pain. (*Id.*).

On September 16, 2002, Plaintiff saw Dr. Martin P. Jones, Jr. complaining of whole body, back and left leg pain. (Tr. 184-85). A physical examination revealed no acute distress and no evidence of paraspinal spasm or soft tissue swelling, although Plaintiff did have some tenderness to deep palpation of the low lumbar spine. (Tr. 184-85). An MRI performed on September 23, 2002, indicated a normal lumbar spine with no disc herniation, spinal stenosis or significant neural foraminal narrowing. (Tr. 186).

On November 19, 2002, Plaintiff was treated by Dr. Gene L. Watterson, Jr. of the Alabama Orthopedic and Spine Center on referral from Dr. Kinnebrew. (Tr. 197-200). Dr. Watterson's examination of Plaintiff's hands revealed mild tenderness diffusely over the DIP, PIP, and MCP joints in addition to the dorsal wrists; however, no deformities were identified. (Tr. 198). An examination of Plaintiff's back was found to be negative for any deformity. (*Id.*). Plaintiff had full range of motion in her shoulders with no weakness or tenderness. (*Id.*). There was mild to no tenderness and/or swelling in Plaintiff's knees, hip, feet or ankles. (*Id.*). Dr. Watterson diagnosed Plaintiff's musculoskeletal pain as soft tissue-related with suspicion of fibromyalgia due to her chronicity and characteristics of reproducible tenderpoints during examination. (*Id.*). He found Plaintiff's presentation and history were not strongly suggestive of being treated with an operative process with respect to her symptomatology. (Tr. 199). Dr. Watterson also noted Plaintiff's exam may imply a component of left median neuropathy, for which he recommended the use of an ACE-style wrist splint. (*Id.*). On April 3, 2003, Plaintiff returned to Dr. Watterson with complaints of

myalgic-type musculoskeletal pain. (Tr. 329-30). Following an examination, Dr. Watterson assessed Plaintiff with fibromyalgia as her predominate etiology regarding her musculoskeletal pain. (Tr. 329).

On April 14, 2003, Plaintiff saw Dr. Bradley S. Goodman. Dr. Goodman's assessment of Plaintiff found normal nerve conductions of both hands with no electrodiagnostic evidence of carpal tunnel syndrome or peripheral neuropathy. (Tr. 328).

Due to increased fibromyalgia symptoms, Plaintiff was examined again by Dr. Watterson on July 9, 2003 and underwent a total body bone scan on July 21, 2003. (Tr. 326-27). The bone scan revealed probable mild degenerative findings in the lower cervical spine and left knee. (Tr. 326). On September 9, 2003, Plaintiff presented to Dr. Watterson with symptoms of diffuse musculoskeletal pain without interval improvement. (Tr. 320). Upon examination, Dr. Watterson found Plaintiff had no palpable abnormality or spasm in identifiable areas and full range of motion throughout. (*Id.*).

On August 4, 2003, Dr. James A. Flanagan, a rheumotologist, treated Plaintiff for bilateral leg pain. Plaintiff complained the pain was worse on the left than the right, with paresthesias about both upper extremities. (Tr. 244). Dr. Flanagan noted that although clinically Plaintiff had a kyphis deformity of her cervical spine with diminished sensation over the median and ulnar nerve distribution of the hand, she did not have any motor weakness. (*Id.*). Plaintiff demonstrated positive straight leg raising bilaterally with no motor dysfunction distally. (*Id.*). Dr. Flanagan reported that an x-ray of Plaintiff's cervical spine revealed some significant cervical kyphosis at C4-5 and C5-6 with disc space narrowing and osteophyte formation. (*Id.*). Dr. Flanagan reported x-rays of Plaintiff's hands, pelvis, hips and lumbar spine revealed no abnormalities. (*Id.*). Plaintiff

demonstrated excellent range of motion of her hips and showed no clinical abnormalities of her hands. (*Id.*). Upon completion of the examination, Dr. Flanagan questioned whether or not Plaintiff fit the diagnosis of fibromyalgia. (*Id.*).

On August 25, 2003, Plaintiff was seen by Dr. Zenko J. Hrynkiw on referral from Dr. Flanagan. (Tr. 235). Plaintiff presented with a two to three month history of neck and left arm pain. (*Id.*). Dr. Hrynkiw noted that Plaintiff's complaints may be related to a motor vehicle accident she was involved in four years prior when she suffered whiplash. (*Id.*). Plaintiff demonstrated normal range of motion of her head and neck, noting painful audible cracking, and painful range of motion in her right arm. (*Id.*). Although Plaintiff's range of motion of her legs was notable for tenderness in the left hip, the motor exam of her legs was normal. (*Id.*).

On September 9, 2003, Plaintiff returned to Dr. Goodman complaining of neck, low back and left hip pain, made worse by standing and walking. (Tr. 211-12). Dr. Goodman noted that although Plaintiff was in mild distress, her cervical range of motion was within normal limits, as was her upper and lower extremities and lumbar spine. (Tr. 212). Dr. Goodman's assessment was bilateral neck pain with radiation into the left upper extremity, low back pain in the L5-S1 segmental regions, and left greater trochanteric bursitis. (*Id.*). Dr. Goodman prescribed trigger point injections and physical therapy. (*Id.*).

Plaintiff returned to Dr. Watterson on December 9, 2003 with myalgic-type musculoskeletal pain and complaints of poor sleep. (Tr. 317). Dr. Watterson's impression of Plaintiff showed no improvement and continued with his assessment of fibromyalgia. He recommended that she continue to see Dr. Goodman relative to her symptoms of physical/spinal discomfort. (Tr. 317-18). Dr. Watterson also noted, "[s]he seems somewhat unsettled regarding embracing my overall

impression." Dr. Watterson recommended obtaining a second rheumatological opinion. Plaintiff said she would like to pursue that. (Tr. 318).

On December 15, 2003, Plaintiff again saw Dr. Goodman with complaints of on-going left side low back pain and left hip pain, and a history of fibromyalgia. (Tr. 316). Plaintiff reported that the prescribed injections did not provide her with relief, but the prescribed physical therapy provided her with general relief which resulted in a 50% improvement overall in her neck and low back. (Tr. 316). Dr. Goodman assessed Plaintiff with ongoing low back pain on the left and left hip pain with CT myelogram that is essentially normal. (*Id.*).

Upon referral of Dr. Goodman, Plaintiff was seen by Dr. Krishna P. Reddy on January 19, 2004 with complaints of chronic fatigue, blurred vision, occasional chest pain with shortness of breath, a history of poor appetite, and history of joint pain, stiffness, back pain, difficulty in walking, nervousness, and depression. (Tr. 222-23). Dr. Reddy assessed Plaintiff with combination-type headaches, brief episodes of left-sided numbness on two occasions, and because she is a smoker, she does have a risk factor for cerebrovascular disease. His recommendation was to conduct a head MRI, MRA, and also carotid Doppler, and see Plaintiff back after those tests to decide the course of action regarding her headache prophylaxis. (Tr. 222).

Plaintiff was again seen by Dr. Reddy on April 13, 2004. Dr. Reddy noted that Plaintiff had cancelled a couple of appointments and stopped taking her prescribed medication. (Tr. 220). Dr. Reddy's findings were that Plaintiff's MRI and MRA were normal with a neurological evaluation of unremarkable. (*Id.*).

On May 10, 2004, Plaintiff was seen by Dr. Flanagan because of continuing left hip pain and developing right hip pain. (Tr. 233). Dr. Flanagan noted that because Plaintiff reported that she did

7

not respond to injections, the only other alternative was excision of her trochanteric bursa. (Tr. 233). Plaintiff underwent the excision on May 25, 2004, after which she was assessed with chronic trochanteric bursitis of the left hip. (Tr. 282).

Upon seeing Dr. Reedy on June 14, 2004, Plaintiff commented that the prescribed Amitriptyline did not improve her condition. (Tr. 350). Dr. Reedy made note that Plaintiff was under a significant amount of stress and there was a lot of tension in her shoulders and neck. (*Id.*). Dr. Reedy prescribed a trial of Flexeril to help relieve Plaintiff's pressure-type headaches. (*Id.*).

On July 21, 2004, Plaintiff was seen by Dr. Kinnebrew for headaches, dizziness, ringing in her ears, and bilateral shoulder pain. (Tr. 291). Dr. Kinnebrew's assessment included headaches, vertigo, degenerative joint disease, and viral syndrome. (*Id.*). Plaintiff was prescribed Phenergan without codeine. (*Id.*).

On August 16, 2004, Plaintiff was re-examined by Dr. Hrynkiw, on referral from Dr. Flanagan. (Tr. 379). Dr. Hrynkiw noted that he had seen Plaintiff in 2003 and diagnosed her with cervical spondylosis and found no role for surgical intervention. (*Id.*). Plaintiff complained of left arm and hand numbness and weakness, left leg and foot numbness and weakness, loss of vision, shortness of breath, chest pain, and bowel and bladder dysfunction. (*Id.*). Dr. Hrynkiw's examination revealed left triceps weakness, upper extremity deep tendon reflexes normal, head and neck range of motion within normal limits and not painful, painful range of motion of the left upper extremity, positive straight leg raise with left dorsiflexor weakness, and negative cross-leg on the right. (*Id.*). Plaintiff's diagnosis was cervical and lumbar radiculopathy. (Tr. 380.).

On August 23, 2004, Dr. Hrynkiw's review of Plaintiff's studies suggested degenerative changes and he recommended conservative management. (Tr. 378). Dr. Hrynkiw referred Plaintiff

to Dr. Goodman for cervical epidural steroid blocks, but Plaintiff did not want to go because she had seen him before. (*Id.*). On October 4, 2004, Dr. Hrynkiw saw Plaintiff in a follow-up for her neck and left arm pain after having received an epidural block two months prior. (Tr. 377). Although her neurological examination revealed left biceps and triceps weakness, Plaintiff had a normal range of motion. (*Id.*). Dr. Hrynkiw ordered epidural blocks and discharged Plaintiff noting, "neurologically I have nothing to offer the patient." (*Id.*).

Plaintiff was given a cervical epidural steroid block on October 11, 2004. (Tr. 293-98). Plaintiff then saw Dr. Santosh S. Kansal on October 21, 2004 for a consultative physical examination. (Tr. 307-09). Plaintiff complained of chronic hip and low back pain, neck pain radiating into both shoulders, swelling in her feet, shooting pain in the left foot which causes her pain all the time, and that she had fibromyalgia. (Tr. 307). Plaintiff also mentioned that she had been told she had a disease of the cervical spine and glaucoma of the left eye. (*Id.*). Plaintiff stated that she had used a cane daily for three years. (*Id.*). Plaintiff reported that she did very little housework and drove short distances for shopping, but did care for herself. Dr. Kansal noted that Plaintiff seemed to be overreacting and overstating her symptoms. (Tr. 308).

Upon examination, Dr. Kansal found Plaintiff had no edema of the feet, no ankle swelling, no tenderness, and no limitation of movement. He found her side-to-side movement seemed to be borderline limited, noting she had a slight limp on the left side. He noted her left hip movement seemed to be limited, but right hip movements not limited as much. Her spine showed no deformity or localized tenderness, although she complained of pain all over her body. She showed no swelling in her muscles and there was no localized tenderness or spots. (Tr. 308-09). Dr. Kansal's notes indicate Plaintiff had no wasting of her extremities, her sensations were all preserved, and her

9

reflexes were normal. (Tr. 308). Based on a Medical Source Opinion completed by Dr Kansal, he found Plaintiff was able to do the following: stand 1 hour at a time, and 6 to 7 hours total in an 8-hour day; sit for more than 1 hour at a time, and sit for 3 to 4 hours total in an 8-hour day; and walk ½ hour at a time 2 to 3 hours in an day. Further, he opined Plaintiff was able to lift and carry 5 pounds occasionally, but could never push/pull with her arms, work in extreme cold and humidity, in proximity to moving mechanical parts, or in high exposed places. He also reported Plaintiff could constantly handle and feel, and occasionally push/pull with her legs, climb, balance, stoop, kneel, crouch, and crawl, and frequently work in extreme heat and vibration. (Tr. 311-13).

On November 26, 2004, Plaintiff presented to the emergency room at Carraway Methodist Medical Center with complaints of neck pain, headache, bilateral hip pain, and back pain. (Tr. 358). However, records indicate Plaintiff was in no acute distress. (Tr. 359). Plaintiff moved all extremities and was oriented three times. (*Id.*). After Plaintiff was prescribed Demerol and Phenergan IV's for headache and neck pain, she was discharged in stable condition from the emergency room in less than two hours. (Tr. 360).

Plaintiff was last seen by Dr. Kinnebrew on January 17, 2005, with complaints of joint pain all over, worse in her hips and right shoulder, and headaches. (Tr. 353). After examination, Dr. Kinnebrew assessed Plaintiff with headache, fibromyalgia, hip and back pain. (*Id.*). Plaintiff was prescribed injections and medication to control her pain complaints. (*Id.*).

On February 15, 2005, Plaintiff underwent an attorney-arranged consultative examination by Dr. David A. McLain. (Tr. 393-401). Dr. McLain noted a past medical history of bursal excision for chronic trochanteric bursitis of the left hip, COPD-chronic bronchitis, depression, and arthritis. (Tr. 394). Dr. McLain noted on review of Plaintiff's systems that she reported fatigue, trouble

getting dressed, getting out of the bathtub, opening jars, chest pain and edema, shortness of breath, dry mouth, abdominal pain, constipation, numbness in her hands and feet, and depression. (*Id.*). Dr. McLain's examination of Plaintiff revealed that her neck was supple with no masses and no cervical adenopathy despite being tender to palpation. (Tr. 395). Plaintiff had normal range of motion and strength in her right lower extremity and a limp with antalgic gait on the left leg. (*Id.*). Plaintiff's left hip was tender and she had 15 to 18 tender points characteristic of the fibromyalgia syndrome. (*Id.*). Dr. McLain assessed Plaintiff with fibromyalgia, trochanteric bursitis of the left hip, retrolisthesis of C5 on C6, cervical disc disease, cervical spine stenosis, osteoarthritis of the cervical spine, thoracic spine, hands, and left ankle, chronic bronchitis, with a history of Lyme disease, and totally disabled from any employment. (*Id.*). Dr. McLain opined that Plaintiff could lift and carry only five pounds occasionally, sit for four hours and stand and walk combined for only one hour in an eight hour day. (*Id.*). He opined that Plaintiff could not push/pull, climb/balance, perform gross manipulations, bend, stoop, operate motor vehicles, or work around hazardous machinery, dust, allergens, or fumes. (Tr. 397).

## II.     ALJ Decision

Determination of disability under the Act requires a five-step analysis. *See* 20 C.F.R. § 404.1 *et. seq.* First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations. Fourth, the Commissioner determines whether the claimant's RFC can meet the physical and mental demands of past work. The claimant's RFC is what the claimant can do despite her impairment. Finally, the

Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work.  In making this final determination, the Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and RFC are the same as the criteria listed in the Appendix.  If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will not review the claim any further.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that [s]he can no longer perform h[er] former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted).  Once a claimant shows that she can no longer perform her past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

The ALJ found that Plaintiff has not engaged in substantial gainful activity since August 1, 2002, her alleged onset date of disability, and met the disability insured status requirements of Title II of the Act.  (Tr. 39).  Based on the medical evidence presented, the ALJ concluded that Plaintiff has a combination of "severe" impairments–cervical and lumbar radiculopathy and fibromyalgia; however, these impairments or combination of impairments do not meet or equal a Listing of Impairments in the Act. (*Id.*).  The ALJ found Plaintiff's subjective complaints regarding her ability to work are inconsistent with the medical evidence in the record and Plaintiff's own statements. (*Id.*).  The ALJ determined that Plaintiff retains the RFC to perform the exertional demands of sedentary work with a sit/stand option, a temperature controlled environment, no unprotected heights, occasional fine manipulation, occasional bending, stooping and squatting, and no use of left

leg/foot push/pull controls. (*Id.*). The ALJ found Plaintiff is not disabled as the Act defines that term and, therefore, is not entitled to a period of benefits. (Tr. 40).

The ALJ called Mary Kessler, Ph.D., a vocational expert ("VE"), to testify and Dr. Kessler was present throughout the hearing and familiar with Plaintiff's background. (Tr. 23, 449-62). The VE considered Plaintiff's past relevant work and concluded that her past relevant work was not within her RFC. (Tr. 449-62). However, the VE testified that Plaintiff would be able to work sedentary jobs as a receptionist/clerk, of which 6,000 such jobs exist in the north central Alabama area; sorter/sampler/inspector, of which 5,000 such jobs exist in the north central Alabama area; and cashier, of which 11,000 such jobs exist in the north central Alabama area. (*Id.*). Based on the VE's testimony, the ALJ found that Plaintiff retained the RFC to perform a significant number of sedentary-type jobs that exist in significant numbers in the national economy. Therefore, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. (Tr. 39-40).

### III.     Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed, or in the alternative, remanded for further consideration. (Doc. #9, at 11). Plaintiff argues that the ALJ failed to properly (1) apply the Eleventh Circuit's three-part pain standard, and (2) consider the medical evidence of record. (*Id.*).

### IV.     Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

**V.      Discussion**

In light of the legal standards that apply in this case, the court rejects Plaintiff's arguments for remand and/or reversal. For the reasons outlined below, the court finds that the ALJ relied on substantial evidence and applied the proper legal standards.

**A.     The ALJ Properly Applied the Eleventh Circuit's Three-Part Pain Standard.**

Plaintiff's first argument is that the ALJ failed to properly apply the Eleventh Circuit's three-part pain standard. (Doc. #9, at 3-7). In particular, Plaintiff claims that the ALJ failed to properly consider the medical evidence of record regarding her subjective complaints of pain. (Doc. #9, at 7). The ALJ found Plaintiff's severe impairments to be cervical and lumbar radiculopathy and fibromyalgia. (Tr. 39, Finding No. 2). Plaintiff contends that the ALJ failed to consider the severity of the medical condition that examining and treating physicians noted in her medical records. (Doc. #9, at 7). Plaintiff contends further that the ALJ, therefore, did not apply the three-part pain standard when considering both her subjective complaints and medical records. (Doc. #9, at 7).

The standard for subjective complaints of pain or other symptoms requires satisfaction of two parts of the three-part test as follows:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Although such evidence is itself sufficient for a finding of disability, the ALJ may elect not to credit a claimant's subjective complaints. *See id.* If an ALJ discredits a claimant's subjective description of their condition, "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). Such a finding does not require the use of thaumaturgic phrases; all that is required is a clearly supported credibility determination. *See id.* However, the ALJ must explicitly discredit the testimony and must articulate sufficient reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

15

Here, the ALJ specifically found that Plaintiff's subjective complaints of pain and alleged physical restrictions were not corroborated by the objective evidence to the extent that, at all times on and after August 1, 2002, she has been unable to perform the requirements of sedentary work. (Tr. 24-39). Although the ALJ found that Plaintiff met the first requirement of the test by demonstrating that she has a history of cervical and lumbar radiculopathy and fibromyalgia, the ALJ found that Plaintiff did not meet either prong of the second part of the standard. The ALJ concluded that the objective evidence does not confirm the severity of Plaintiff's alleged symptoms and Plaintiff's testimony was less than credible given the substantial evidence of record. (*Id.*). As the ALJ noted, although the evidence establishes underlying medical conditions capable of producing pain and other limitations, substantial evidence as a whole does not support a conclusion of any objectively determined medical conditions that are of such severity as to give rise to disabling pain. (Tr. 38).

In addition, there are inconsistencies in Plaintiff's testimony and medical records which call into question her overall credibility. (Tr. 36). Plaintiff testified the real reason she quit working at the bowling alley is because the bowling alley closed. She had reported she does no household chores, has problems performing personal hygiene activities, and does not drive due to her medical condition. (*Id.*). However, Plaintiff testified that she did not drive because she did not have a driver's licence. (Tr. 436). Also, Plaintiff still went grocery shopping and took care of her personal needs. (Tr. 435). Further, Plaintiff testified that her doctor told her she would need back surgery in the near future (Tr. 442); however, the evidence of record does not contain any entries by any treating physician substantiating her testimony. Contrary to Plaintiff's testimony, treatment records of Drs. Hrynkiw, Flanagan, and Watterson indicate that no surgical intervention was considered.

Taking into consideration Plaintiff's medical evidence, her own statements, the opinions of her treating physicians as to her physical abilities, and her testimony regarding her daily activities, there was more than substantial evidence to support the ALJ's decision to give less than full credit to Plaintiff's subjective complaints. Substantial evidence also supports his finding that Plaintiff has the RFC to perform sedentary work.

In summary, the court is satisfied that the ALJ properly evaluated all of the medical evidence of record, including evidence related to Plaintiff's RFC, and consistent with that evidence, reached the determination that there are a significant number of jobs in the economy of which Plaintiff could perform in the sedentary range. The ALJ's opinion in this case clearly sets out the medical evidence regarding all of Plaintiff's alleged impairments. (Tr. 23-40). The ALJ specifically noted that he considered Plaintiff's impairments both singularly and in combination. (Tr. 39). The ALJ further noted that although Dr. Kessler testified to Plaintiff's limitations, she found that Plaintiff was able to perform such sedentary jobs as receptionist/clerk, sorter/sampler/inspector, and cashier. (Tr. 38). Thus, the court finds that the ALJ properly considered all of Plaintiff's impairments in combination when he determined that Plaintiff was not eligible for benefits and that finding is supported by substantial evidence.

      **B.    The ALJ Properly Considered the Medical Evidence of Record.**

Plaintiff also contends that the ALJ failed to give proper weight to Dr. McLain's opinion. (Doc. #9, at 8). Dr. McLain is a certified rheumotologist who completed a physical evaluation of Plaintiff, although the evaluation was not sought in order to obtain treatment. (Tr. 398-401). Dr. McLain also completed a physical capacities evaluation of Plaintiff, and relied heavily on Plaintiff's subjective report of symptoms and a clinical evaluation to support his opinion–not the medical

evidence of record. (Tr. 397). Therefore, the physical capacities evaluation form is conclusory because it grows out of Dr. McLain's reliance on Plaintiff's subjective pain complaints and clinical evaluation only. (Tr. 397-401). Plaintiff argues that Dr. McLain's records support his opinion and that his opinion is supported by the remaining medical evidence of record. (Doc. #9, at 8-9).

The ALJ's decision to discount Dr. McLain's opinion is supported by substantial evidence. First, Dr. McLain's conclusions were inconsistent with the totality of the medical evidence of record, as well as Plaintiff's own testimony regarding her activities of daily living. (Tr. 24-25). Thus, Dr. McLain's conclusions do not deserve controlling weight under the Regulations. 20 C.F.R. § 416.927(d)(2). If an opinion is not due controlling weight, the factors to be considered in determining what amount of weight should be given to the opinion include the length of treatment relationship and frequency of examination, the nature and extent of treatment relationship, the supportability of the opinion, its consistency with the record, and the health care provider's specialization. *See* 20 C.F.R. § 416.927(d)(2)-(6). The opinion of a treating physician may be discounted when the opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or if the opinion is inconsistent with the record as a whole. *See id.; Crawford*, 36 F.3d at 1159-60; *Phillips*, 357 F.3d at 1240-41.

In this case, Dr. McLain's conclusions are unsubstantiated by any specific clinical, objective or medical findings. (Tr. 36). Furthermore, there is no evidence to suggest that Dr. McLain's opinion was due any weight by the ALJ because he did not indicate the diagnoses upon which he based his limitations. (Tr. 397-401). The ALJ properly discounted Dr. McLain's opinion due to its inconsistency with the totality of the medical evidence of record, as well as Plaintiff's own testimony. (Tr. 24-34).

## VI.     Conclusion

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination.  The Commissioner's final decision is therefore due to be affirmed and a separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this        29th         day of September, 2008.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE